UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
X------------------------------------------------------------------X

IRFAN ASHRAF, individually and on behalf of all
others similarly situated,

                                 Plaintiff,            17-CV-5956 (KAM)(CLP)

                -Against-                  **ORAL ARGUMENT**
                                          **REQUESTED**

LABORATORY CORPORATION OF AMERICA
HOLDINGS, THE CITY OF NEW YORK &
MEERA JOSHI.

                                Defendants.

X------------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN <u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>


**Daniel L. Ackman**
222 Broadway, 19th Floor
New York, NY 10038
Tel: (917) 282-8178
E-mail: dan@danackmanlaw.com

May 15, 2018

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT                                                    1

FACTUAL AND LEGAL BACKGROUND                                             1

    TLC Drug Testing Practice                                           1

    The Suspension of Mr. Ashraf                                        3

ARGUMENT                                                                 6

  I.     STANDARD OF REVIEW                                               6

  II.    THE TLC DENIES DRIVERS FAIR WARNING
           THAT THEY WILL BE SUSPENDED WITHOUT
           ANY HEARING BASED ON A PUTATIVELY
           POSITIVE DRUG TEST                                               7

        A.  The Right to Fair Warning of the Law is Fundamental           7

        B.  No City Code or TLC Rule Provides Fair Warning               10

  III.   THE TLC'S SUSPENSION OF MR. ASHRAF
           WITHOUT NOTICE OR A HEARING OF
           ANY KIND WAS A DENIAL OF DUE PROCESS                            14

  IV.   THE TLC'S AGENT WAS NEGLIGENT IN
           CONDUCTING THE DRUG TEST AND
           THE CITY IS VICARIOUSLY LIABLE                                  18

  V.    PLAINTIFF'S STATE LAW CLAIMS ARE
           WITHIN THIS COURT'S JURISDICTION,
           ARE TIMELY AND MERIT SUMMARY JUDGMENT                           20

    CONCLUSION                                                          23

# TABLE OF CASES

**Case**     page

*Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420 (N.Y. 2013) .......................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 7

*Barry v. Barchi*, 443 U.S. 55 (1979) ............................................................................... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 6

*Bell v. Burson*, 402 U.S. 535(1971) ........................................................................... 7, 16

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty.*
    *v. Earls*, 536 U.S. 822 (2002) ................................................................................. 3

*Boddie v. Connecticut*, 401 U.S. 371(1971) .................................................................. 14

*Borgia v. New York*, 12 NY2d 151 (N.Y. 1962) ........................................................... 21

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ....................................................... 9, 14

*Carver v. Nassau County Interim Finance Authority*,
    730 F.3d 150 (2d Cir. 2013) .................................................................................. 20

*Chainani by Chainani v. Bd. of Educ. of City of New York*,
    87 N.Y.2d 370 (N.Y. 1995) .................................................................................. 18

*City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156 (1997) .............................. 20

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ................................... 14, 15

*Day v. Moscow*, 955 F.2d 807(2d Cir.1992) ................................................................. 20

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163 (2d Cir. 2014) .......................................... 7

*DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir.2003) .................................................. 14

*Elite Med. Supply of New York, LLC v. State Farm Mut. Ins. Co.*,
    No. 13-CV-918-A, 2014 WL 823439 (W.D.N.Y. Mar. 3, 2014) ........................... 20

*FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307 (2012) ..................................... 7, 8

*Felder v. Casey*, 487 U.S. 131(1988) ........................................................................... 20

*Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311
(2d Cir.2000) .................................................................... 20

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ........................................ 14

*Gilbert v. Homar*, 520 U.S. 924 (1997) ....................................... 17

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ...................................... 15

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.
489 (1982) ........................................................................ 9

*Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348 (1961) ................... 20

*Johnson v. United States*, 135 S.Ct. 2551 (2015) ...................... 9, 13

*Kleeman v. Rheingold*, 81 N.Y.2d 270 (N.Y. 1993) ..................... 18

*Landon v. Kroll Lab. Specialists, Inc.*, 22 N.Y.3d 1 (N.Y. 2013) ........... 18, 19

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) ............................... 9

*Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209
(2d Cir. 2002) .................................................................. 18

*Mackey v. Montrym*, 443 U.S. 1 (1979) ..................................... 18

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) .................. 11

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................... 15, 16

*Matter of Cordero v. Corbisiero*, 80 N.Y.2d 771 (N.Y. 1992) ............ 22

*Matter of Lawrence*, 24 N.Y.3d 320 (N.Y. 2014) ......................... 21

*Matter of Singh v. Taxi and Limousine Comm.*,
282 A.D. 2d 368 (1st Dep't 2001) ....................................... 22

*Matter of Udodenko v. City of New York,* 5 Misc 3d 207
(N.Y. Cty. 2004) ............................................................... 22

*McLean v. City of New York*, 12 N.Y.3d 194 (N.Y. 2009) .............. 19

*Margerum v. City of Buffalo*, 24 N.Y.3d 721 (N.Y. 2015) ............................................... 20

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir.1993) ........................................... 6

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .................................................. 7, 16, 17, 19

*Padberg v. McGrath-McKechnie*, 203 F.Supp.2d 261
    (E.D.N.Y. 2002) ................................................................... 7, 15, 16, 17

*Papachristou v. Jacksonville*, 405 U.S. 156 (1972) ........................................... 9

*Residents & Families United to Save Our Adult Homes v. Zucker*,
    No. 16CV1683 NGG RER, 2017 WL 5496277 (E.D.N.Y 2017) ........................... 20

*Roach v. Morse*, 440 F.3d 53 (2d Cir. 2006) ................................................... 16

*Rothenberg v. Daus*, 2012 WL 1970438 (2d Cir.2012) ...................................... 8, 14, 16

*Rothenberg v. Daus*, No. 08-CV-567 SHS, 2014 WL 3765724
    (S.D.N.Y. 2014) ..................................................................... 11

*Sebastian v. State of New York*, 93 NY2d 790 (N.Y. 1999) ............................ 19

*Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) (April 17, 2018) ...................... 8, 13

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ............ 2, 12

*SEC v. Sloan*, 436 U.S. 103 (1978) ............................................................. 8

*U.S. v. Lanier*, 520 U.S. 259 (1997) ........................................................ 9

*Valdez v. City of New York*, 18 N.Y.3d 69 (N.Y. 2011) ................................ 19

*Williamson v PricewaterhouseCoopers LLP*, 9 NY3d 1 (N.Y. 2007) ............ 21

*Zinermon v. Burch,* 494 U.S. 113, 127 (1990) ............................................. 14

**Statutes, Rules and Other Authorities**

Fed. R. Civ. P. 56 ....................................................................................... 7

NYC Admin. Code § 19-505 ....................................................................... 4

NYC Admin. Code § 19-507.1 ..................................................................... 14

NYC Admin. Code § 19-512.1 ............................................................................. 5, 10, 11

N.Y.C. Administrative Procedure Act §1043 ................................................................. 22

N.Y. State Administrative Procedure Act § 202 ........................................................... 22

TLC Rule 54-04 ................................................................................................................. 2

TLC Rule 54-14 ................................................................................................................. 2

TLC Rule 68-14 ................................................................................................................. 4

TLC Rule 68-15 ................................................................................... 4, 5, 10, 11, 12

TLC Rule 68-20 ................................................................................................................. 4

5 U.S.C. § 553 ................................................................................................................. 22

28 U.S.C. § 1367 ............................................................................................................. 21

## PRELIMINARY STATEMENT

In January 2016, the New York City Taxi and Limousine Commission (TLC) suspended the license of plaintiff Irfan Ashraf, a longtime taxi driver, without any notice or opportunity to be heard. That suspension was based on an allegedly positive drug test. In fact, as the TLC later acknowledged, the test result was erroneous. While Ashraf's license was later reinstated, his suspension continued for approximately 11 months, including for 69 days after a DNA test demonstrated the error—all without a hearing.

The TLC policy that allowed this suspension denied Ashraf Due Process of Law in two ways. First, because there is no city code or regulation authorizing suspensions based on drug tests, he was denied fair warning of the law. Second, it violated without good cause the general rule that an individual should not be denied an important right without notice and an opportunity to be heard. The policy and practice that permitted the suspension also violated the New York Constitution, the City Charter and TLC rules. Finally, the is liable for its agent's negligence in conducting the drug testing.

## FACTUAL AND LEGAL BACKGROUND

### TLC Drug Testing Practice

While defendants have never proffered any evidence that intoxicated driving is a substantial problem among taxi drivers, the City of New York, acting through its TLC, requires drug testing of taxi and for-hire vehicle drivers. (For ease of reference, we will refer to both groups as taxi drivers or drivers.) There is no city ordinance that requires or authorizes such testing. But Chapter 54 of the TLC Rules, which pertains to drivers[1] allows the agency to direct a

---

[1] Chapter 54, one of more than 20 TLC rule chapters, which was in effect at the time of Ashraf's suspension, is formally titled "Drivers of Taxicabs and Street Hail Liveries." It was replaced as of October 26, 2016 by Chapter 80 of the TLC rules, which covers all for-hire vehicle drivers licensed by the TLC. The substance of the rules pertinent to this action did not change. Other TLC rule chapters are

driver to submit to a drug test "for cause" if the TLC "has a reasonable suspicion that a Driver has used a Drug that makes him or her unfit to operate a Vehicle safely." TLC Rule 54-14(c). TLC rules also mandate suspicionless annual testing at the driver's expense. TLC Rule 54-14(c)(2). Rule 54-14(c)(3) states: "*Results of Drug Test*. Driver must pass every drug test, including 'For Cause' drug tests under[TLC Rule] 54-14(c)(1) and 'Annual' drug tests under §54-14(c)(2)." The rules permit a driver to be fined if he does not appear for testing within a specified window and permit the driver to be suspended "until compliance." If the results of either test are positive, or if the sample cannot be tested, TLC Rule 54-14(c)(3) provides that the driver's license "*can* be revoked *after a hearing*." (emphasis added). In their 30-page memorandum in support of their motion to dismiss, defendants do not cite these rules. They do not cite any other section of the driver rules even though this is the chapter that covers drug testing.[2]

The TLC practice is not a normal reaction to a positive drug test. It is extreme, an outlier. Aside from cases dealing with the drugging of racehorses, we are not aware of any federal or New York case that permits a summary suspension of a trade license based solely on a suspicionless drug test. Certainly, the City cites no such case.

By contrast, in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), where the Supreme Court permitted post-accident suspicionless drug testing, the "regulations require[d] that the [testing agency] notify employees of the results of the tests and afford them an opportunity to respond in writing before preparation of any final investigative report." And when a drug test leads to a disciplinary proceeding, the railroad must allow for follow-up blood testing and, if it presumes impairment, it must "provide detailed notice of this presumption to its

---

collected on the TLC website. http://www.nyc.gov/html/tlc/html/rules/rules.shtml.

[2] For the Court's convenience, a copy of the pertinent TLC rules is annexed as Exhibit 2 to the Declaration of Daniel Ackman (PX __)).

employees, and advise them of their right to provide a contemporaneous blood sample." *Id*. at 610-11. In *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, the Supreme Court permitted drug testing of certain students, but noted, "the test results are not turned over to any law enforcement authority. Nor do the test results here lead to the imposition of discipline or have any academic consequences." 536 U.S. 822, 833-34 (2002).

## The Suspension of Mr. Ashraf

On January 12, 2016, Ashraf, who had been licensed by the TLC for approximately 20 years, and who had taken and passed multiple drug tests, submitted to a suspicionless drug test at a LabCorp facility in Brooklyn. Ashraf Dec. ¶¶ 2-4. The TLC suspended Ashraf's license on or around January 21, 2016 without a hearing or process of any kind. Ashraf Dec. ¶ 5. Indeed, at that time, the TLC did not afford Ashraf notice of why he was suspended and did not schedule a hearing. While the City's brief states that mandatory "Guidelines" direct that a medical review officer "attempt[] to contact plaintiff to ascertain whether there was any acceptable medical basis for the positive test," in fact, the MRO did not contact Ashraf before his suspension. Ashraf Dec. ¶ 6. The agency simply blocked his access to the T-PEP system, onto which a yellow cab driver must log in to gain access to the taxi's meter. Ashraf Dec. ¶ 5.

On January 22, Ashraf went the TLC office in Long Island City to find out why he could not log in. He was told that his license had been suspended because he had failed the drug test. Ashraf Dec. ¶ 7. On or around January 27, 2016, he took another drug test, performed by another laboratory, which was arranged by his doctor. The results were negative for marijuana and the eight other illicit drugs for which he was tested. Ashraf Dec. ¶ 8. The TLC's practice, however, is to give no weight to any test other than LabCorp's. Parker Dec. ¶ 5.

An unsigned letter dated February 3 informed Ashraf that he had tested positive "for drugs"—the type of drug was not stated. The letter offered "a retest of the original specimen (not

3

a new lest) at your [Ashraf's] expense." DX E. Ashraf declines since he was convinced that the sample containing marijuana metabolites was not his. Ashraf Dec. ¶ 9. There was no separate sample to test in any event. While LabCorp is licensed to do drug testing, in its work for the TLC it does *not* follow all federal guidelines. Specifically, in its TLC testing, LabCorp admits it does not use split samples (meaning it does not keep a "B" sample that can be tested separately from an "A" sample, a practice that is required by U.S. Department of Transportation Guidelines). PX 3.

The TLC sent Ashraf a written notice of his suspension on or around March 3, 2016 approximately 49 days after the failed drug test results were forwarded to the TLC.[3] DX F. This late notice was in plain violation of TLC Rule 68-15, which requires written notice within five days of a summary suspension. The March 3 letter summoned Ashraf to a hearing on March 10, 2016 to determine whether his license should be revoked. This hearing was 40 days after the suspension. The letter said the hearing would be "pursuant to TLC Rule 68-15(a)(l)," and it cited TLC Rule 68-14 and NYC Admin. Code § 19-505(l), apparently as grounds for a possible license revocation. Neither provision, however, makes any mention of drug testing or that a positive test could lead to either revocation or suspension without a hearing.[4] Neither notice makes any factual allegation that Ashraf was addicted to drugs, that he was ever intoxicated while on duty or that he (for some other reason) posed a threat to public safety.

On March 10, the TLC agreed to an adjournment of the hearing as Ashraf's lawyer. Michele Parker, had just been retained. Parker Dec. ¶ 4. Though his revocation hearing was

---

[3] The February 3, 2016 letter cites TLC Rule 68-21(a)(1), *which is not a TLC Rule at all*. The last section of the adjudications chapter of the TLC Rules is Rule 68-20.

[4] As discussed below, the City's brief does not cite any of these rules as giving fair warning of the suspension penalty. It cites instead Admin. Code Section 19-512.1(a) and TLC Rule 68-15(a)(1), neither of which is mentioned in the hearing notices.

adjourned, the TLC continued Ashraf's suspension. Ashraf Dec. ¶ 12. Later, Ashraf, through counsel, requested that the TLC provide the urine tested by LabCorp so he could submit it for DNA testing. Parker Dec. ¶ 7. Rather than simply ask LabCorp for the sample, the TLC refused to provide it unless Ashraf obtained a subpoena signed by an administrative law judge. *Id*. This insistence, which is not based on any TLC rule, delayed the testing and extended Ashraf's suspension.

On or about June 23, a City administrative law judge signed a subpoena and directed the TLC to notify LabCorp to release Ashraf's urine sample to another laboratory of Ashraf's choosing for DNA testing. Parker Dec. ¶ 8. On or about August 12, Ashraf's sample was delivered from LabCorp directly to Mitotyping Technologies, the testing company retained by Ashraf at his own expense. Parker Dec. ¶ 8; Ashraf Dec. ¶ 14.

On or about September 30, Ms. Parker and counsel for the TLC met and the TLC counsel opened the enveloped containing the DNA test results conducted by Mitotyping Technologies. Parker Dec. ¶ 9. Those results confirmed that the sample tested by LabCorp did not match Ashraf's DNA, meaning the sample tested was not his urine. PX 4. Thus, while the precise cause of the error cannot be known, it is apparent that the testing lab made a mistake related to the chain of custody of Ashraf's sample. Nevertheless, the TLC did not reinstate Ashraf's license on that date. Parker Dec. ¶¶ 9-10.

On October 21, the TLC agreed to withdraw its petition to revoke Ashraf's license. But it still insisted that his license remain on suspension until Ashraf took and passed another drug test. Parker Dec. ¶¶ 11-12. On or about November 2, Ashraf submitted to a drug test at a LabCorp facility. That test was completed on around November 4 and the results were negative. Parker

Dec. ¶ 13; Ashraf Dec. ¶ 18. Neither LabCorp nor the TLC, however, informed Ashraf of those results until around November 16. *Id*.

On November 18, Ashraf went to the TLC offices in Long Island City to ask why TLC had not reinstated and mailed him his license. He was told that his records were not updated. Ashraf's taxi driver's license was finally reinstated on December 8, 2016. Ashraf Dec. ¶ 19. All told, Mr. Ashraf's suspension lasted 329 days. That period included 69 days *after* the TLC knew that Mr. Ashraf' positive test result was false.

Ashraf filed a notice of claim with the NYC Comptroller on or around February 16, 2017. The Comptroller's office summoned Ashraf for a deposition, but made no further response to the notice of claim.

## ARGUMENT

### I.       STANDARD OF REVIEW

On a motion to dismiss all well-pleaded factual allegations are taken as true and all inferences are drawn in the plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). The complaint must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).

Meanwhile, summary judgment should be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the evidence, viewed in the light most favorable to the party against whom it was entered, demonstrates that

there are no genuine issues of material fact and that the judgment is warranted as a matter of law." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation omitted). In determining whether an award is appropriate, the Court should consider the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). In this case, plaintiffs' factual statements are supported by documentary evidence and defendants' admissions.

## II.     THE TLC DENIES DRIVERS FAIR WARNING THAT THEY WILL BE SUSPENDED WITHOUT ANY HEARING BASED ON A PUTATIVELY POSITIVE DRUG TEST

### A.     The Right to Fair Warning of the Law is Fundamental

A taxi driver's license is a form of property that cannot be denied without due process of law. *Bell v. Burson*, 402 U.S. 535, 539 (1971); *Nnebe*, 644 F.3d at 158; *Padberg v. McGrath-McKechnie*, 203 F.Supp.2d 261, 276 (E.D.N.Y. 2002). As the Court of Appeals noted in *Nnebe*, "even a [brief] loss [of income] can be deeply problematic for a taxi driver." 644 F.3d at 159. The right to fair warning of conduct that is forbidden or required and to the penalty that may be imposed for misconduct is "fundamental" and "essential to the protections provided by the Due Process Clause." *FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012). Nevertheless, the City's defense to Ashraf's fair warning claim is mostly boilerplate case citations, which somehow omits recent Supreme Court precedents and even Second Circuit cases against the City and the TLC.

In *SEC v. Sloan*, a case concerning the summary suspension of trading in a security, the Supreme Court called "the power to summarily suspend …without any notice, opportunity to be heard, or findings based upon a record" an "awesome power with a potentially devastating

impact" and that a "clear [legislative] mandate" was necessary to confer it. 436 U.S. 103, 112 (1978). The Second Circuit held in *Rothenberg v. Daus*, also an action against the City based on the TLC's conduct, "Even in the civil regulatory context … we cannot defer to [an agency's] interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." 2012 WL 1970438 (2d Cir.2012) (internal quotation omitted).

A few weeks later after *Rothenberg*, the Supreme Court ruled even more emphatically in *FCC v. Fox Television*. The Court held: "A *fundamental principle* in our legal system is that laws which regulate *persons or entities must give fair notice of conduct that is forbidden or required*. This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. It requires the invalidation of laws that are impermissibly vague.…" 132 S.Ct. 2307, 2317 (2012) (internal citations, quotations and parentheticals omitted, emphasis added). The Court added, "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id*.

Even more recently the Supreme Court applied the fair warning or void-for-vagueness doctrine to invalidate penalties in the immigration context. In *Sessions v. Dimaya*, the Court stated: "The prohibition of vagueness in criminal statutes … is an essential of due process, required by both ordinary notions of fair play and the settled rules of law." 138 S.Ct. 1204, 1212 (2018) (April 17, 2018) (citations and internal quotations omitted). This doctrine, the Court added "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Id*. (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). Finally, "[T]he doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." The *Sessions v. Dimaya*

court relied on *Johnson v. United States*, 135 S.Ct. 2551 (2015), decided just three years earlier. In *Johnson*, the Court added that fair warning "principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Id*. at 2557. In *Johnson* and *Sessions*, the Court applied the principle to collateral effects of criminal convictions.

It is often said, as the City notes, that the degree of vagueness that the Constitution permits varies in part on the nature of the enactment. Indeed the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Sessions*, 138 S.Ct. at 1212 (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 498–499 (1982)). But *Sessions* and *Johnson* were both civil matters. *Sessions*, 138 S.Ct. at 1213. So was *FCC v. Fox Television*, which involved regulatory penalties. The same is true of *Rothenberg*, which involved a penalty imposed by the TLC. Of course, defendants acknowledge none of these cases, though they do cite a district court decision in *Rothenberg*.

Plaintiff's Fair Warning claim is not "the typical 'void for vagueness' situation" where the question is whether "men of common intelligence must necessarily guess at [the law's] meaning." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). Plaintiff's claims are grounded in a distinct but "related manifestation of the fair warning requirement." *U.S. v. Lanier*, 520 U.S. 259, 266-67 (1997). The Court explained in *Bouie*:

> When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. 378 U.S. at 352.

## B.  No City Code or TLC Rule Provides Fair Warning

The degree of vagueness in this case is extreme. None of the rules or statutes that defendants intimate might provide some clarity does anything of the kind. The only law mentioned in the TLC violation notice dated February 3, 2016 is "TLC Rules [sic] § 68-21(a)(1)." DX E. *But there is no such rule.* The TLC hearing notice dated March 3, 2016 indicates that Ashraf was "suspended, pursuant to TLC Rule 68-15(a)(1)." DX F. That rule does exist and it provides: "The Chairperson can summarily suspend a License if the Chairperson believes that continued licensure would constitute a direct and substantial threat to public health or safety, pending revocation proceedings." It adds that "substantial threats to public health or safety would include but are not limited to: (i) Any act, as prohibited by these Rules, of *driving a TLC licensed vehicle while Impaired* by intoxicating liquor (regardless of its alcoholic content), or Drugs." TLC Rule 68-15(a)(1)(i) (emphasis added). There was, however, no allegation that Ashraf ever drove a TLC licensed vehicle (or any vehicle) while impaired. And there is nothing in this rule that gives warning that a driver might be suspended based on a positive drug test, which, even if accurate, does not demonstrate on-duty impairment or on-duty drug use. Neither notice mentions TLC Rule 54-14(c)—or any other part of the Driver Rules. This omission obfuscates the law further as Rule 54-14(c) is the rule that requires drug testing and the driver rules a

In their brief advocating dismissal, defendants do not cite Rule 68-15 or (the non-existent) Rule 68-21 as alone giving fair warning. They point instead to NYC Code § 19-512.1(a) and TLC Rule 68-15(a)(1) and assert that these provisions, apparently together, "give fair warning" that TLC "may summarily suspend a license 'for good cause shown relating to a direct and substantial threat to the public health or safety and prior to giving notice and an opportunity for a hearing,'" without indicating what provision the brief is quoting. Def. Br. at 17.

It seems that the City is quoting § 19-512.1, which is titled "Revocation of Taxicab, For-Hire or Hail License or Licenses." A taxicab license is a license to operate a taxicab; it is synonymous with a taxi medallion. Thus in *Rothenberg v Daus*, Judge Stein held, "[This] provision … is facially inapplicable" in an action concerning taxi *drivers* licenses. No. 08-CV-567 SHS, 2014 WL 3765724, at *9 (S.D.N.Y. 2014). As Judge Stein said, § 19-512.1 "is limited to 'a taxicab or for-hire vehicle license.' …. Other provisions of the Code, by contrast, regard 'a taxicab or for-hire vehicle *driver's* license.' *See*, *e.g.*, *id.* § 19-507.1(a)(1) (emphasis added)" There is a difference between the two licenses, each "separately define[d]" by the NYC Code. Thus, Judge Stein held, "The verbiage of the Code makes clear that Section 19-512 .1(a) applies to licenses for vehicles and not to licenses for drivers." *Rothenberg*, 2014 WL 3765724, at *9 (emphasis added).[5] As this precise issue fully and fairly litigated an was decided against the City, defendants are collaterally estopped arguing to the contrary. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).[6] Nor can defendants' counsel claim ignorance on this point because two of the City's lawyers in this case, Horowitz and Ms. Weinblatt, also represented the City in *Rothenberg*. Thus neither NYC Code § 19-512.1 nor Rule 68-15(a)(1) provides drivers with fair warning of the law either separately or together.

Later, the City says, "Rule 68-15(a)(1), when read in conjunction with other TLC rule provisions," supports its "interpretation." Here, however, the City does not even say what "other" TLC rules its litigators have in mind. Nor does it explain why various rules must be read

---

[5] Knowing the rules themselves do not provide fair notice, defendants cite a statement related to a TLC rulemaking *from 2005*. Def. Br. 18. Nothing in that statement says that a driver may be summarily suspended based on a putatively positive drug test. Even if it did, it does not relate to the rules in effect in 2016 or for many years before 2016. And even if the document had any facial relevance to the case at hand, which it does not, none of the Supreme Court's cases permit reliance on legislative history (much less regulatory history) to cure unconstitutional vagueness in statutes.

[6] Judge Stein granted reconsideration in part of this decision, but not on this point.

"together" with Rule 68-15(a)(1). And the City also does not say why taxi drivers are expected to read several rules together and then reach an "interpretation" (which may be one of several plausible interpretations). The City also fails to explain why a driver (or anyone else) would look to the Adjudications chapter of the TLC rules rather that to the Driver chapter, which covers drug testing and states the penalty—post-hearing—for a positive test.

The City's brief adds, without citation to *any* authority, that "A licensee's failure to pass an annual, mandatory drug test is … good cause." *Id*. Nothing in the TLC rules or in New York law says so. Finally, the brief announces: "A licensee of ordinary intelligence should know that failing a drug test poses an immediate risk to public safety prompting summary suspension, pending revocation proceedings." *Id*. But how would a licensee "know that" when the rules, which could say it clearly, do not say it at all.

The statement is also false factually in its claim that there is an "immediate risk." Ashraf did nothing to suggest that he was ever intoxicated while on duty. He did cause an accident. He was not driving erratically. More generally, the TLC has admitted that a positive drug test "does *not* show that the driver was under the influence at the time of testing.… The metabolites for drugs stay in the system for varying periods of time, in some cases days, weeks or even months after drug use." PX 5 at ¶ (Fraser Declaration)[7]; *see also Skinner*, 489 U.S. at 631 (assuming "urine test results disclosed nothing more specific than the recent use of controlled substances"). The National Highway Traffic Safety Administration takes the same position. Its 2014 research note states, "Data identifying a driver as 'drug positive' indicates only that a drug was in his/her system at the time of the crash. It does not indicate that a person was impaired by the drug. The presence of some drugs in the body can be detected long after any impairment." PX 6 (citation

---

[7] The same declaration by Charles Fraser, then the TLC's general counsel, admits that the TLC does not test for alcohol "because use of alcohol is legal." PX 5 at ¶ 25.

omitted). Indeed, the TLC has admitted that over a nine-year period, it *never* had occasion to test a driver "for cause" based on a reasonable suspicion of on-duty drug use. Even among taxi drivers who have tested positive, not even one was found to be impaired while on duty. Indeed, in a nine-year period, *none* of the drug test hearings was based on "for cause" testing. PX 7. In the same way a driver can take a drink or even several drinks on Saturday night and be perfectly competent to drive on Monday morning, another driver might ingest marijuana on Friday and be safe to drive on Tuesday. There is, therefore, absolutely no evidence to support the City's assertion that "failing a drug test poses an immediate risk to public safety."

Even if the TLC's rote protest that a positive drug test evinces "an immediate risk" could be taken at face value, there is no public safety exception to the Due Process Fair Warning requirement. After all, many people think it is very important for public safety to deport immigrants who have convicted of an aggravated felony or a violent felony. Nevertheless, the Supreme Court held the federal government's pursuit of that end unconstitutional when its action was premised on a statute that was void for vagueness. *Sessions,* 138 S.Ct. at 1212-13; *Johnson*, 135 S.Ct. at 2556-57.

At least the deporting authorities in *Sessions* and *Johnson* could point to a statute that appeared to permit their actions. The TLC's own lawyers do not even know what statute or rule provides permits their suspensions. Is it the non-existent TLC Rule 68-21? Is it the statute that does not even apply to taxi drivers, NYC Code § 19-512.1? Is it another TLC Rule, Rule 68-15(a)(1), that permits suspensions for driving while impaired by intoxicating liquor or drugs? Is it Rule 68-15(a)(1) read "in conjunction" with other unidentified rules? If the TLC's lawyers, including litigators with months to file a brief, are hopelessly confused, how can the rules or the NYC Code be said to give (mostly immigrant) taxi drivers fair warning? The plain truth is that

none of the various rules (or the one code provision) that defendants have thrown into the mix clearly state that a driver who tests positive for drugs can be suspended without notice or a hearing. A driver who is tested without suspicion, without having been in an accident, without ever appearing to be intoxicated while on duty, reading the TLC rules, would have "no reason even to suspect," *see Bouie*, 378 U.S. at 352, that he will be suspended without a hearing of any kind.

### III. THE TLC'S SUSPENSION OF MR. ASHRAF WITHOUT NOTICE OR A HEARING OF ANY KIND WAS A DENIAL OF DUE PROCESS

Due process is a flexible concept. Nevertheless, "'[T]he root requirement of the Due Process Clause' is 'that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest.'" *Zinermon v. Burch,* 494 U.S. 113, 127 (1990) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)); *see also DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir.2003). As a general rule, depriving someone of a property interest prior to a hearing will be condoned only in "extraordinary situations." *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972) (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

Defendants do not argue that any of the recognized exceptions to the general rule apply here. Instead, they misrepresent the holding in the district court's decision in *Rothenberg* as concerning "the issue of whether a pre-suspension hearing was required when a taxicab driver fails a drug test." But, as Defendants' counsel well know, *Rothenberg* concerned (among other issues) whether the TLC's *post*-suspension process was consistent with due process. 2012 WL 1970438, *6. The Court of Appeals was crystal clear on this distinction, stating, "The magistrate judge erred by … [being] under the misimpression that the hearings took place *prior* to deprivation, and the district court erred by leaving the magistrate judge's … analysis unchanged even though it recognized that the hearings occurred *after* deprivation." *Id*. (emphasis added).

Defendants also ignore Judge Dearie's decision in *Padberg*, where he awarded the taxi driver-plaintiffs summary judgment, holding the TLC's denial of a pre-deprivation hearing was a Due Process violation, despite charges that the drivers had engaged in what he characterized as a racially motivated service refusal. 203 F.Supp.2d at 277–82. Judge Dearie said that adequate post-deprivation procedures without pre-deprivation process may satisfy due process requirements where a State must act quickly, or where it would be impractical to provide pre-deprivation process. *Id*. at 277. But Defendants do not and cannot claim that a brief pre-deprivation hearing would have been impractical here. Nor do they cite any case where a positive drug test alone permitted the denial of a pre-deprivation hearing.

Judge Dearie applied the familiar balancing test enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). That test favored the taxi drivers in *Padberg* and it favors plaintiff here. Under *Mathews*, the Court must consider: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail. 424 U.S. at 335.

As in *Padberg*, Ashraf's interest in his taxicab license "is profound." 203 F. Supp.2d at 278. Suspending a license "does far more than inconvenience drivers; it deprives them of their very livelihood." *Id*. Thus, the Supreme Court has recognized on a number of occasions that a person's means of support enjoys heightened significance. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. at 543; *Bell v. Burson*, 402 U.S. at 539; *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). Judge Dearie found *Bell* to be "particularly notable" because in that case, the Supreme Court "specifically acknowledged that a driver's license, once issued, could become

"'essential to the pursuit of a livelihood.'" *Bell*, 402 U.S. at 539, 91 S.Ct. 1586. "Such is undeniably the case with the plaintiff taxi drivers." *Padberg*, 203 F. Supp.2d at 278.

Despite this authority, defendants assert that Ashraf's "interest is not entitled to significant weight since the summary suspension is subject to Article 78 review." Def. Br. 10. But in advancing this argument, defendants ignore that the TLC made the same argument in both *Nnebe* and *Rothenberg* and that the Court of Appeals rejected it both times. *Nnebe*, 644 F.3d at 155 (citing Article 78 argument), *Rothenberg*, 2012 WL 1970438 at *7; *see generally Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (J. Sotomayor) ("Plaintiffs suing under 42 U.S.C. § 1983 generally need not exhaust their administrative remedies").

The second *Mathews* factor requires the court to evaluate the risk of erroneous deprivation. Obviously an error was made in this case. Nevertheless, defendants assert there was "little room for error" due to the "nature of the infraction." Def. Br. 12. By this argument, defendants appear to suggest that drug testing is generally accurate (though not always). But this suggestion only obfuscates what the City claimed in the same brief is the standard for summary suspension. The question, by defendants' own reckoning, was *not* whether the positive result was true or false. The question was whether Ashraf posed "direct and substantial threat to public health or safety." Def. Br. 4. An assessment that Ashraf posed a threat to public safety—and this is the standard *that the City says* it must meet—would require a fairly complex and subtle calculus of Ashraf's overall record, not just reading a drug test result. On that question the possibility of error is rife. Certainly, in Ashraf's case, there being no suggestion he was ever impaired while driving, there would be no basis for finding him a threat.

Moreover, the post-suspension hearing was not prompt, coming 40 days after the summary suspension. And there is evidence that suggests that there is a high error rate in the

initial suspensions. The MRO retained by he TLC conceded that "the reversal rate [for TLC testing of drivers renewing licenses] was 44 percent from January 2005 through August 2012." PX 3 at 70-71. This means that 44 percent of the time, the MRO changes a positive result to a negative result. *Id*. The MRO, of course, can only change the result if she actually contacts the driver. In this case, the MRO did not do so. And the MRO who worked for Doctors Review Service admitted he did not know generally what percentage of the time he succeeded in contacting drivers who appeared to test positive. PX 8.

The Second Circuit's decision in *Nnebe*, which defendant do not cite, does not support their position. In *Nnebe*, the Court of Appeals permitted an exception to the general rule when a police officer made an arrest for what the TLC called a "serious" crime. Such an arrest is presumably premised on a finding that there was probable cause that a crime was committed. The case has nothing to do with a drug test that is not based on probable cause. Moreover, the *Nnebe* court's decision as to pre-suspension hearing was specifically premised on there being a meaningful "prompt post-deprivation hearing" that determined whether the driver's licensure posed a "threat to public safety." 644 F.3d at 159-60. If there was, in fact, no such hearing, the Second Circuit's mandate was for the district court to reconsider its decision "in it entirety." *Id*. at 163. Here, the *Nnebe* court was adhering to Supreme Court decisions which condition the right to deny a pre-deprivation hearing on there being meaningful post-deprivation process. *Mackey v. Montrym*, 443 U.S. 1, 12 (1979); *Barry v. Barchi*, 443 U.S. 55, 66 (1979); *see also Gilbert v. Homar*, 520 U.S. 924, 932 (1997) ("So long as a suspended employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial").

In this case, the City makes no claim that it offers *any* hearing at *any* time into whether the driver is a public threat. The post-suspension hearing under TLC Rule 54-14(c)(2) concerns only whether the positive test result is correct. *See Rothenberg*, 2014 WL 3765724, at *23-24

(describing hearing and concluding they were adequate "because the drug tests were reliable").

Whether the driver is a threat to public safety has nothing to do with it. As in *Padberg*, a "[p]rompt,

meaningful" hearing, without a summary suspension, held soon after the drug test result is

known "would meet the TLC's legitimate goal, providing the same impact and deterrent effect."

203 F.Supp.2d at 281.

## IV.  THE TLC'S AGENT WAS NEGLIGENT IN CONDUCTING THE DRUG TEST AND THE CITY IS VICARIOUSLY LIABLE

New York law recognizes a cause of action for negligent drug testing. *Landon v. Kroll*

*Lab. Specialists, Inc.*, 22 N.Y.3d 1, 7–8 (N.Y. 2013). More specifically, the New York Court of

Appeals has held that a duty of care runs from a drug-testing laboratory to a test subject. *Id*. at 6-

7. In this case, an independently conducted DNA test established that the urine sample

purportedly provided by Ashraf was not his. While plaintiff cannot know precisely how this error

occurred, the TLC implicitly admitted this error when it agreed to reinstate Ashraf's license.

Thus there is substantial and unrebutted evidence that LabCorp breached its duty of care,

creating ground for a negligence claim. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d

209, 215 (2d Cir. 2002) (summarizing elements of negligence claim under New York law).

LabCorp, of course, is the City's agent; it was designated by the TLC as the exclusive

drug tester of taxi drivers. DX B. Under New York law, a principal can be held liable for the

actions of an independent contractor-agent under the doctrine of *respondeat superior* if the

principal is discharging a non-delegable duty. *Chainani by Chainani v. Bd. of Educ. of City of*

*New York*, 87 N.Y.2d 370, 380-81 (N.Y. 1995) This exception may be "invoked where the

particular duty in question is one that is imposed by regulation or statute." *Kleeman v. Rheingold*,

81 N.Y.2d 270, 274–75 (N.Y. 1993). Here, the obligation to conduct drug testing was imposed

on the TLC by TLC Rule 54-04(h). Thus, the TLC cannot disclaim liability for its agent's negligence.

The cases the City cites provide no defense. *Valdez v. City of New York*, 18 N.Y.3d 69 (N.Y. 2011) and *McLean v. City of New York*, 12 N.Y.3d 194 (N.Y. 2009), conclude that a municipality may avoid liability in a negligence action if the municipality establishes that it was entitled to a governmental function immunity defense or if the plaintiff fails to establish that it was owed a special duty of care. But drug testing is not a traditional governmental function. It is conducted by and for many private sector firms. "Companies drug test a lot less than they used to — because it doesn't really work, " Washington Post, March 10, 2015 (Despite a decline, the most recent American Management Association survey indicated that 62% of employers require drug testing). The drug testing here was performed by a private company. And the subject of the tests are not government employees but "private earners who hold a public license." *Nnebe*, 644 F.3d at 162. The function at issue is similar to medical services that may be delivered "by the government in hospital-type settings [but] are more akin to private, proprietary conduct." *Applewhite v. Accuhealth, Inc*., 21 N.Y.3d 420, 426 (N.Y. 2013). Where government provides services that "traditionally have been supplied by the private sector" it is subject to ordinary tort liability." *Id*. (quoting *Sebastian v. State of New York*, 93 NY2d 790, 793 (N.Y. 1999)).

*Landon v. Kroll Lab.,* holds that a drug testing firm "owe[s] a duty" to drug test subjects. 22 N.Y.3d at 6. The City does not dispute that basic principles of *respondeat superior* allow it to be held liable for its agent's negligence. Thus, plaintiff is entitled to summary judgment on this claim.

## V. PLAINTIFF'S STATE LAW CLAIMS ARE WITHIN THIS COURT'S JURISDICTION, ARE TIMELY AND MERIT SUMMARY JUDGMENT

As is well-known, state notice of claim provisions do not apply to Section 1983 claims. *Felder v. Casey*, 487 U.S. 131, 140 (1988); *Day v. Moscow*, 955 F.2d 807, 814 (2d Cir.1992). The Notice of Claim provision in NY General Municipal Law §50-i also does not apply to City Administrative Procedure Act (CAPA) claims because it is limited to actions for "personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence." *Margerum v. City of Buffalo*, 24 N.Y.3d 721, 730 (N.Y. 2015).

The City's second jurisdictional defense is that a City Administrative Procedure Act (CAPA) claims are "typically" enforced in Article 78 actions and that federal courts lack jurisdiction because "New York State has not empowered the federal courts to consider such claims." This suggestion, while arguably grounded older district court decisions, ignores basic of federal law and more recent Supreme Court, Second Circuit and E.D.N.Y. precedent. First, New York law does not determine whether federal courts have jurisdiction over a given dispute; federal law determines it. "Congress has never excluded disputes of the kinds within an Article 78 proceeding, or any similar state-law proceeding, from the subject matter jurisdiction of federal courts." *Elite Med. Supply of New York, LLC v. State Farm Mut. Ins. Co.*, No. 13-CV-918-A, 2014 WL 823439, at *5 (W.D.N.Y. 2014) (citing *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348 (1961); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311 (2d Cir.2000)).

More specifically, the Second Circuit has never held that federal courts may not exercise supplemental jurisdiction over CAPA claims or claims that are "typically" (by the City's reckoning) Article 78 claims. Indeed in *Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150, 155–56 (2d Cir. 2013), it suggested the opposite in light of *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156 (1997). *City of Chicago* actually started as the Illinois version

of an Article 78 action. In it, the Supreme Court specifically rejected the proposition that the City asserts. Relying on the plain language of 28 U.S.C. § 1367(a), the Supreme Court concluded that a developer's unsuccessful efforts to challenge the landmark designation of its buildings, which was the focus of its state claim for administrative review, did "form part of the same case or controversy" along with its federal Takings Clause claim. 522 U.S. at 166. The Supreme Court stressed, "That is all the statute requires to establish supplemental jurisdiction." *Id*. at 165. Judge Garaufis reached the same conclusion just last year in *Residents & Families United to Save Our Adult Homes v. Zucker*, where he wrote, "Supreme Court precedent suggests, however, that federal courts do in fact have jurisdiction over Article 78 claims." No. 16CV1683 NGG RER, 2017 WL 5496277, at *12–13 (E.D.N.Y. 2017) (citing *City of Chicago* and *Carver*.)

Though the City does not dispute that Ashraf served a notice of claim on February 16, 2017, it asserts that the notice was untimely. As Ashraf's suspension was ongoing until December 8, 2016, and because this action is for damages not an injunction, he had until March 8 to serve his notice. Thus the notice was timely. *See Borgia v. New York*, 12 NY2d 151, 155 (N.Y. 1962) ("[W]hen the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the 'accrual' comes only at the end of the treatment."); *see also Williamson v. PricewaterhouseCoopers LLP*, 9 NY3d 1, 9 (N.Y. 2007); *Matter of Lawrence*, 24 N.Y.3d 320, 341 (N.Y. 2014) ("The two prerequisites for continuous representation tolling are a claim of misconduct concerning the manner in which professional services were performed, and the ongoing provision of professional services with respect to the contested matter or transaction.").

None of its technical defenses permit the City to avoid the merits of plaintiff's claims. On the merits, the TLC is enforcing a rule—a positive drug test leads automatically to suspension—

that was not lawfully enacted pursuant to public notice and comment. This is the kind of on-the-fly rulemaking that CAPA, part of the City Charter, is designed to prevent. Section 1043(b) requires that city agencies publish proposed rules and allow the public to comment before enactment. There is no other way, as the statute plainly provides: "No agency shall adopt a rule except pursuant to this section." § 1043. The notice-and-comment requirement is a central principle of administrative law. It is articulated not just by the City, but also by the federal Administrative Procedure Act (see 5 U.S.C. § 553 [c]) and by the New York State Administrative Procedure Act (see SAPA § 202[5] [b], [c]).

New York Courts have strictly enforced the notice-and-comment requirement, including against the TLC. In *Matter of Miah v Taxi and Limousine Comm. of the City of New York,* 306 A.D.2d 203 (1st Dep't 2003), the TLC purported to change the policy for computing the way "points" would be charged against cabbies pursuant to its persistent violator program. The Appellate Division held that this "amounted to a rule change requiring compliance by [the TLC] with the public hearing procedures set forth in the New York City Administrative Procedure Act…. Inasmuch as it is plain that respondent's new rule was not duly adopted in accordance with the procedures set forth in the [CAPA], the revocation of petitioner's taxi driver's license pursuant to that rule was arbitrary and capricious." *Id*. In *Matter of Singh v. Taxi and Limousine Comm.*, the Appellate Division held that the TLC's unannounced change in method for calculating the "grace period" pertaining to license renewals also violated CAPA. 282 A.D. 2d 368 (1st Dep't 2001); *see also Matter of Udodenko v. City of New York,* 5 Misc 3d 207 (N.Y. Cty. 2004) (change in policy pertaining to timing of drug tests; resulting suspension and fine voided).

The courts in these TLC cases applied a well-settled principle of New York law. For example, in *Matter of Cordero v. Corbisiero*, 80 N.Y.2d 771 (N.Y. 1992), a jockey had been suspended for violating a racing authority rule while competing at the Saratoga racetrack. The racing board determined that he would have to serve the suspension at Saratoga, rather than at Belmont or Aqueduct. The New York Court of Appeals voided the adjudicatory rule because it could not be enforced absent notice and comment. In this case, the TLC plainly failed to comply with CAPA in creating its summary suspension rule. As the facts are undisputed, plaintiff is entitled to summary judgment on this claim.

## CONCLUSION

Because the TLC has violated a fundamental principle by imposing a penalty not based on law, because it has enforced a rule that has not been duly enacted, because it has done so without giving Ashraf an opportunity to be heard and for all the reasons stated, plaintiff's motion for summary judgment as to liability should be granted and defendant's motion to dismiss should be denied.

Dated: New York, New York
May 15, 2018

__/s/_____
Daniel L. Ackman
Law Office of Daniel L. Ackman
222 Broadway, 19th Floor
New York, NY 10038
Tel: (917) 282-8178
dan@danackmanlaw.com

*Attorney for Plaintiff*